May it please the court. My name is Helen Bruner. I'm here for the United States in this appeal. At the time of his arrest on December 14th, 1999, Ahmed Ressam was perilously close to achieving his goal of murdering and injuring hundreds of innocent victims and severely disrupting air travel in the United States by detonating a powerful bomb at the Los Angeles International Airport. He was convicted after a jury trial of nine crimes for his actions, and following that, the 22-year sentence that the district court imposed the second time in December of 2008, that sentence the government contends You know, I think there's no one here who's not familiar with the facts. Can I? Because time is limited. Yes, Your Honor. The panel in this case went off on procedural error. I just want to make sure I understand the position of the United States as to whether we can or should review for procedural irregularity. Let's not talk about anything else. I just want to know what is the position of the United States as to what we ought to do on procedural issues. Your Honor, let me say first that the government has briefed this case and argued this case and asked this Court to consider substantive reasonableness. And that is the argument that we've presented. Always good to start off with a non-answer. Let's – why don't you answer my question and then tell me anything else you want to tell me. I will listen carefully. But I don't want to forget my question. And I don't – I want to make sure I have it firmly in mind when you answer. Do we, as the panel did, can we, should we, both can we and should we review for procedural error? The answer to your question is yes, I think you can review for procedural error in this regard, and what I mean by that is this. There is a continuum between procedural – what is procedural and substantive. And by – procedural obviously being at one extreme, calculating the guideline range, and at the other – at the other extreme for substantive, the actual weighing of the sentence. I think to the extent that you're in the middle where you are looking at the reasons for the court's – the sentence that was given and the court's explanation, there is certainly an overlap. And in that sense, this Court would look at those explanations. Let's say we are not in the middle. Let's say we are at the extreme procedural end. Okay. Just so we eliminate things from the case. Exactly. Okay. Let's say we are not in the middle. Can we, should we, review for procedural error? Not in this case. Okay. And that is because the United States has waived the issue. Am I correct? That is correct. We never made any argument in this case related at all to the guidelines calculation. In fact, you – in your brief stated that there is not a procedural irregularity. That is absolutely correct, Your Honor. So in essence, insofar as procedural – in essence, you – and I know you want to be wrong in coming off – going off a procedural three-judge panel, believe was wrong. You like the result and you agree with the outcome, but you think the three-judge panel was wrong, do you not, in finding procedural error? And I want to be careful, Your Honor, in saying this. I know you want to be very careful. Yes. I say yes. But in this sense, I don't think this – I think the panel, as I read the panel opinion, read the procedural error, that is to say, looking at the explanation that the district court gave at the time of sentencing and used that in its determination that there was a substantively unreasonable sentence. And I guess the government's position all along has been, regardless of the argument or the explanation that the district court gave in this case, that that explanation and the record as a whole, whether you look at the record as a whole or the pre-sentence report, take any – take that all in combination, none of those things would support the 22-year sentence as reasonable in this case. Can I – I'd like to ask you a question that I hope opposing counsel also will answer. When we're looking at substantive reasonableness, which is the main thrust, if not the only thrust of your argument, how do we decide that? By what standard do we measure it? Is it whether the sentence shocks the conscience given the record and the nature of the crime? Is it some other standard? How do we know unreasonableness when we see it either too high or too low? Your Honor, I've given obviously a great deal of thought to that question, and I've also looked at the cases from other circuits in trying to come up with a formulation. I think as a starting matter, a sentence is unreasonable if it fails to meet the sentencing purposes set forth in 3553A. I think that's clear. I think a sentence is also substantively unreasonable if this Court concludes that the sentence is either an arbitrary sentence or that the district court failed to account for one or more relevant factors where those factors should have been given weight. In this case, the main issue between the parties as to reasonableness, as I understand it, has to do with the cooperation and what weight should be given to it. I understand there's others, but a lot of it – and cooperation as such is not in 3553A, or is it? It is not directly. It is not mentioned in 3553A. However, I think it comes in in two places. It comes in both from the purposes of the Guidelines, because after all, there's 5K1.1 and substantial assistance is still in the Guidelines, and number two, in the history and characteristics and nature and characteristics of the defendant. So to the extent that the defendant agrees to cooperate and carries through, which Ahmed Rousan did not, the benefit of his bargain, I think that is something that goes to this defendant's character and should be considered. I think this Court has been clear that. What do we do in a case like this where the district court judge very carefully went down all the 3553A factors and, I mean, made statements like, I believe that the sentence I am imposing today will serve as a deterrent while promoting respect for the American rule of law, simply because I might not agree with him, the fact that that's his judgment? How much deference must we give his judgment when he's done something as thorough as this? And that question comes to mind because of your debate about cooperation. He found that cooperation he didn't agree with you on cooperation. He found that the rest of them cooperated enough and that, in fact, the government benefited from this cooperation. Simply because we might disagree with the district court judge, should we be reversing the sentence? No, Your Honor. If it's a simple disagreement that you might impose a slightly higher or slightly lower sentence, since, after all, what is a reasonable sentence is, in fact, a range, surely no. We're not saying that. I think that this Court, for this Court to reverse a sentence must be a very unusual matter. I think it's clear that the government rarely asks for a reversal based on substantive reasonableness. In fact, by my account, this was the only case in two and a half years where we so asked. Well, the standard that's in the cases relates to no reasonable judge would be able to impose that sentence. And as I read the record, at one time the government offered 27 years, then it argued 35, then it argued 45, and then there was a light reference to life, I guess, toward the end. So between 22 and 45, how do you determine what's reasonable if we give deference to the trial judge who met all these procedure requirements and gave his view? If I understand your question, Judge McHugh, I think you come to it by weighing the various factors that are here. And if I can point to a couple of things in the record that address when you say we're at 22, 27, 35, and 45, I think several things have changed over time. At the time that the 27-year bargain was entered into, and I suspect that bargain is something that Mr. Hillyer will take issue with, but in any event, that was a time after his conviction and when everyone assumed he was going to give full cooperation. At the time of the first sentencing in 2005, when the government made a 35-year recommendation, I think if one looks at the sentencing memoranda prepared by the government, we were still trying to encourage that there would be return to cooperation so that we could go forward with the prosecutions of Mr. Doha and Mr. Mohamed. Let's just say we did remand this. And I won't say whether it would go to Judge Kuhnow or some other judge. The judge on remand says 27. Would that be substantively unreasonable? I believe at this point it would be, Your Honor. What about 30? Even though you like 35, the judge says, well, 30. Would that be substantively unreasonable? I don't know that I could say right now whether 30 would be substantively unreasonable. We certainly would be arguing for 45. And I think that we would start. But, see, that's the point, is that the difficulty that I think we have, that I think we're looking for some guidance on, is, you know, where deference ends and substantive unreasonableness begins. And you've already highlighted, even as I finish up, the difficulty in that. So what, on this record, what would you point us to to get to that break point? Your Honor, I would perhaps start at the other end. If Mr. Roussan had not cooperated, I think there's likely very few people who would not say that a sentence of between 65 years to life would be reasonable given a plan to blow up LAX. And the likely result, loss of human life. If one then looks at where you go next, cooperation, the government certainly never backed away from the fact that he gave intelligence value. So when we look at 45-year recommendation, we were still taking into consideration a 20-year reduction in sentence that accounted for cooperation and accounted for information. But what he did not do and what was clear between the 2005 and 2008 sentencing is that the Doha and Mohammed indictments were dismissed, and it became abundantly clear that no further information was coming. And there were recantations, and recantations ultimately at his sentencing were the full. I thought by 2005 he had already, it was already clear that the two prosecutions were not going for it. It hadn't been dropped yet, but what the judge was being told was we're going to have to drop it. Oh, absolutely, Your Honor. I don't mean to suggest otherwise, but I think if one looks at the sentencing memo, and I don't have the site right in front of me right at the moment, but we were very clear also asking the Court to provide whatever encouragement he could to Rahsaan because the government certainly did not want to dismiss these cases. It placed us in a terrible position, and that is a huge change, that and the recantations. Did the government know it? Did the district judge know at sentencing that those prosecutions were not going forward? The district court knew at sentencing absolutely that the government would be placed in a position to dismiss those cases if Rahsaan didn't renew his cooperation. We were clear about that. Were there any other collateral consequences of that order of magnitude that occurred after sentencing that the district court wouldn't have known of? After the sentencing in 2005. In 2008. In 2000, between 2005 and 2008, the recantations were the other major change besides the dismissal. And the district court knew of the recantations when he sentenced Rahsaan in 2008? Yes. Okay. So is there anything that the district court didn't know in 2008 that you know today about the consequences of Rahsaan not cooperating with the government in recanting his testimony? I don't believe so, Your Honor. So the district court had full information in front of it? At least as to what I know today. I mean, if there's new information What exactly are you asking us to do? You're asking us to declare this unreasonable, but not declare what is reasonable and to send it back? I mean, that's the strange position you're putting us in, as I understand it. We're supposed to say what's unreasonable, but we can't say what is reasonable. Your Honor, yes. We certainly are asking this Court to vacate the sentence as unreasonable. And you're not asking us to say what's reasonable. Isn't that the normal practice, that we declare something wrong and send it back to the district judge, who then declares what's right? I think that's exactly correct. In fact, I know of only one case that I found where a health court actually vacated the sentence. I'd be glad to say what is a reasonable sentence if that were our function. But I think our function is to send it back and let the district court decide what is. And I don't think it's to ask you to say whether 23 years is reasonable, 24, 25, 26. It's just to say whether this sentence is unreasonable. It seems to me that the basic argument seems to be on whether there was a violation of the cooperation agreement. And if the district judge did not find that this cooperation agreement was violated sufficiently, then we have to decide whether that was an error of fact when he decided that that was unimportant, that there was a violation of the cooperation agreement. Your Honor, I think that's sort of... Can we answer that yes or no? Yes. I can't even remember it. Well, okay. If you can't remember it, I'll try it again. No, I... Why can't we say, we've looked at this, not that we would, but let's say why couldn't we say 22 is unreasonable and anything under 30 is unreasonable would be unreasonable as well. Why couldn't we say something like that? I believe the Court could certainly... But without saying what more would be... This Court certainly is free to give that kind of guidance to the district court. How about saying anything 22 is unreasonable, anything under 65 is unreasonable? Would you like that? No, but... Whether I would like that or not, if it were not... Let me ask you a somewhat different question, a different area. You mentioned but didn't go into his other cooperation. And I'm not sure how much you can talk about it in open court and how much of it is in sealed record, and I must tell you I haven't looked. But I only have a vague impression of what, except for these two cases that we've talked about and the one conviction that was obtained with his testimony, I understand that he cooperated and provided intelligence of all sorts, both to our government and to governments of foreign nations. Is it okay to say that much? That's correct, Your Honor, and I think... And did the district court know what this cooperation consists of? Oh, I believe it did, Your Honor, for several reasons. And do we know? You do, and it is in the record. There are several things in the record. Can you talk about it in open court? We can talk about that, yes. Can you give us just a little feel for what other things he's done? Well, the testimony, there was both the summaries that were provided by the defense of the proffers that were provided to the court, some of which had information, of course, stricken from them, and those are in the sealed excerpts of record, but were before the district court and are before you. There is also the testimony given by Agent Humphreys, and Agent Humphreys, during the first sentencing hearing in April of 2005, went through a variety of different things. To be as brief as possible, he provided... Rassam provided information about his matriculation to the camps, how he got there, through who he contacted in Pakistan, what training he received from the camps, what help he had received from various individuals in Canada. Wow, that's pretty good stuff, isn't it? It's very good stuff. I mean, I don't know about this stuff, but this is the kind of stuff, if I were on intelligence service, I would think this would be pretty good stuff to know. Your Honor, we never backed away from that. We have always said that... District judge with many years of experience, many, many years of experience, look at that and say, that really is a valuable service to our country. It has not only helped convict one defendant with his testimony, but he's provided this important intelligence data that I judge to be of immense importance to our security, and for that, and in order to encourage others in similar situations to also cooperate in the future, I would give him this gift, essentially. Twenty-two years is, after all, not no time at all, but it is certainly a gloriously... It is certainly a long time, and the government never suggested that the court should not take intelligence value into consideration. Why can't a district judge assess that? I mean, the cooperation with other governments, with our own government, contacts, training procedures. You know, boy, why isn't that the kind of stuff that, essentially, a district judge is in a best position to assess? I don't... I must tell you, I don't... Your Honor, we... Yes. First of all, I don't know that the district judge is in the best position to assess that value. That value is actually something that the government set forth for the district court through testimony. What did the government set forth when it said that 27 years was the minimum he should get? Did it identify the cooperation that would be required? It did in its agreement, Your Honor, and the agreement itself basically says that, among other things, Mr. Roussam shall truthfully testify before the grand jury and at any trial and any other court proceedings with respect to any matters about which the United States Attorney's Office for the Western District of Washington and the Southern District for New York may require his testimony, including but not limited to the trial of U.S. v. Mokhtar Harari and any future prosecutions brought in connection with the participation by Roussam and others in Canada, Afghanistan, and elsewhere in the conspiracy to kill U.S. nationals. And did he repudiate all of that? He did. Wait, I'd like to clarify something. Isn't it the case that the government offered Mr. Roussam a plea deal for 25 years without a cooperation requirement? Yes, and that was withdrawn four months before trial. But you made that offer, 25 years without cooperation. Absolutely. So how is that substantively different than 22 years with cooperation, even though it ceased, but he gave you a lot of cooperation? Well, Mr. Roussam proceeded to trial. Not that he should be punished for that, but I think there is a difference because they have the time. But did he get three points for, did he get an enhancement for not, I mean, he didn't get an, he got, he didn't get a decrease for proceeding to trial because he proceeded to trial, right? No. But I think. So that shouldn't be a consideration. The government's pretrial plea. Wait, I want you to answer my question. If you were willing to accept 25 years with no cooperation and the district court judge gave 22 years and you got some cooperation that was helpful in some cases, how are those substantively different? They're different, Your Honor, because at the time that the 25-year offer was made, the government was not confident that it was going to convict Mr. Roussam on count one. You had a pretty strong case on this, right? We had a strong case. I mean, he comes in across the border with his fingerprints on everything possible. With the liquid in the. In his car. In the car. He dives under the car when they pull him out. There is, however, a difference, I think, and it is this. Count one required us to prove more than just simply that he had the explosives. It required us to prove an intent to certainly seriously injure him. Now, it wouldn't be much of an inference, would it, to infer that intent with what he was found? Because, you know, the. With hindsight. The contraband that he was found with. With hindsight, I would certainly say yes. But what happens in that four-month period is we get the information from the MLAT from Canada that provides his fingerprints on a notebook that also has maps of LAX. Counsel, I have another question for, again, for both of you that I hope you'll be able to address. One of the reasons that the district court gave was proportionality with respect to similarly situated defendants in other jurisdictions. And at least one of the ones that the court pointed to as similar has now been overturned as unreasonably short in the 11th Circuit. What effect does that have, if any, on our assessment of what we should be doing here? Your Honor, I think that we had already in our argument suggested that Mr. Padilla's case was not a complete match. I think it just underscores the 11th Circuit's decision underscores that. I think that's also true with respect to Mr. Lind's sentence as not being of the same type. And I guess I would point the Court to perhaps Richard Reed. Because the crime was less extensive, less heinous? Well, with respect to Mr. Lind, I think that the record in his case establishes at least that it's certainly true and heinous in our view that he would be involved in fighting on the side of the Taliban in Afghanistan. But he disavowed it. Against the northern Afghanistan forces. Right. That was an outrageous sentence, too, but it was too high. Well, Your Honor, where I was going, though, with the argument, if I could, is that he, at least in the record in his case, it's clear that the Court believed he had no intention of carrying out acts in the United States, which this defendant did. And that takes me back to if one looks at Richard Reed or Abu Ali, a case that was decided in the Fourth Circuit, all of those individuals were plotting acts of terror in the United States, faced a life sentence. And what we're talking about is an individual who, while he provided intelligence value, and I guess where I was going with that, Your Honor, is all the intelligence value in the world does not necessarily equate to being a non-intruder. What about helping find a trigger? Didn't he also contribute to convictions in the United States, in France, I think, in Germany, in several different places? He offered a deposition in a case in Germany. I won't try to pronounce the name, but, again, it went to the issue of tradecraft and intelligence value. He provided not direct information about that individual. And Doha and Mohammed, and this is the point I guess I was trying to make, were charged on the strength of his evidence. So it wasn't as if he was providing the key evidence in those trials. What about the detonator and detecting the detonator in the Shuba, in this case? That, again, was something that certainly he provided and provided assistance to Carl Gregg. Which could have made a difference between having whoever was dismantling that device blow up and injure himself or perhaps kill, right? Absolutely, Your Honor. That's not exactly trivial. No. And we've never suggested that it was. We've made that very clear from the get-go. And we don't want to – I don't want to suggest that the government's argument was that there was no value in this cooperation. All we're saying is that if you're starting a life sentence or, say, 65 years as the guideline range, and you're going down from that, that the intelligence value is certainly the government's recommendation was already accounting for 20 years. It just doesn't get us to – Your Honor, although we're not there, I would not – I would certainly suggest that we probably would not be in this court arguing about that sentence. So if you – Let me boil down, then, to Judge Kuhnauer, who said, with reference to weighing these things – he basically disagrees that these two cases somehow undid what he saw as the very significant difference. significant value of the other cooperation. We'd have to determine that that was a clear error finding, wouldn't we? I think you would, and I think you would also have to take a look at a variety of other things that were also, at least the government would argue, worth weighing in this. And that is the timing of his cooperation, the fact that he, in fact, started to renege on his cooperation immediately after the 5K motion, despite the fact that, at the same time, he had, just before that continuance of the sentencing, had sent a letter to the district court saying he would continue to honor his cooperation even after sentencing, which he did not do. Ms. Bruner, aren't you asking this Court to substitute its judgment for that of Judge Kuhnauer? And my question also, is that appropriate after Gall? I mean, are we to re-weigh the factors, the same factors he considered? I think you don't necessarily re-weigh them. I think you take a look at his weighing and see if they're reasonable. And I guess I would suggest, I recognize that Gall says you cannot substitute your judgment for that of the district court. But if it is to have any meaning that you are to review for abuse of discretion, and if the words of the Supreme Court in Rita, that there will be sentences that are outliers, then there will be a time when the weighing is... Well, if you're giving probation in this case, I think that might be that case. I mean, Gall got probation for being a drug dealer on campus, which, next to Charlemont Station, and being a terrorist is, I'm not being facetious here, but, you know, being a drug dealer on campus is, we consider it to be one of the worst crimes in our society, right? Well, Your Honor, I would suggest that Mr. Rassam's crimes are far worse than dealing the drugs on campus. But I see also that I'm beyond my time. Thank you. Yeah, we'll give you a little time for rebuttal, because you've certainly taken up a lot of the time for questions. Thank you, Your Honor. Mrs. Helliard, are you going to submit? Good afternoon, Your Honor. And it may please the Court. My name is Tom Helliard, and I'm a federal defender in Seattle. With me at the table is the brains behind our brief, Alyssa Shook, an attorney in my office, and Dan Kaplan, who offered the amicus brief on behalf of the federal... Are you on the face? Well, I'm the voice, anyway, Your Honor. I'm going to just jump straight into cooperation. If I might, because that is really what this case is all about. And I would like to go back a little bit in the case, because there's certainly a strong suggestion by the government that the Court did not value its assessment of the cooperation sufficiently. And back in, if you go back to ER 784, which is February 26th of 2003, Judge Kunauer made what he called an unusual request at the end of a hearing. And he said, I would like you, Special Agent Fred Humphreys, to help me assess cooperation in this case. Because he could see in that same page of the transcript evidences that he saw there was a storm brewing about, you know, what the value of cooperation was. And the parties had very sharp disagreements, even at that point in time, over what was happening. He asked Agent Humphreys to be at the sentencing hearing. And he asked him to be there because he had, quote, great confidence in his candor and objectivity. So early on in this case, Judge Kunauer is honing in on what the real issue is, and he's making, he's evidencing the idea that he's got his arms around the players in this case. He knows who stands up for what, and who's going to tell the truth, and who's going to give him an idea about this very difficult decision he's going to have to make down the pike because it was a very serious crime. But he saw this as historic cooperation. Two years later, he called Fred Humphreys to the stand, and Agent Humphreys testified about that cooperation that was offered by Mr. Rassam. And he did so in terms which, as some of your questions have suggested, indicate that it was extraordinary by any measure, particularly the intelligence value in particular, assisted law enforcement agents for the first time in knowing about the inner works of Al-Qaeda, which allowed them, as Agent Humphreys said, to do their work, which is to say find out who a terrorist is and go out and arrest them. He said that this, he said that Mr. Rassam provided 130 names and provided descriptions of those people. Of that number, he said, we are fully able to identify at least a fifth of that number. How much of that was recanted? I'm right here. How much of that was recanted? May I call a quick time out? I don't hear as well as I used to. Oh, I'm sorry. I'll try to be louder. Point of personal privilege, please. Thank you very much. How much of the information that you've just described, if any, was recanted? Well, none of that information was recanted. And I think that's an important point in terms of looking forward to when Judge Humphreys would say, I understand that there has been a recantation here that has an effect on two alleged suspects. And he was speaking to a man named Zamiri and another man named Shakura, who were, who was fighting deportation in Canada. And he said, however, and he talked about the extraordinary value of the  But before, he said that in the same page of the transcript. And it was, if I might here, page 41, he said, page 36. And I think it's important he said, he began by saying, you know, I've been thinking about this a long time. And the cooperation weighed heavily in my original sentencing decision. And the import of that has not changed today, which is to say that he understood because he knew the record, that what had happened before couldn't be undone. The import of that intelligence and its ongoing value was something that he cherished and knew and understood. Where exactly does this fit into a sentencing decision? I asked this question before. It's not in 353A as such, right? In other words, it is in so far as it tells you something about his character, but the sort of quid pro quo part of it or the value as such, where does it come in? Well, that's the – it does come in, I think, under 3553A as an indicator of the character of the defendant. As Judge Kunauer said, the fact that he decided to cooperate, putting his own life at risk. But isn't that the ultimate issue here? Because the government's ultimate issue. It seems to me they have a very hard time saying that what he did wasn't quite valuable, even though he didn't do other things. But what they seem to be saying is the fact that he recanted and reneged and didn't follow through suggests that his character is not what the original cooperation suggested. So the question is, what do we do with that? Do we just say, Judge Kunauer was there, he was in a position to assess his character, taking both those things into account, and we defer to it? Well, I think the judge did take that into account. He indicated that I understand that Mr. Rassam has recanted and I understand that he's not a good person by virtue of what he's done. But I have this other information, and I'm looking at him, I'm listening to him, and I believe that his background and his character deserve some consideration. He also indicated that he felt it was important that he acknowledge his cooperation for two reasons. First, because it might discourage future terrorists. So by saying that, what he's implying is that the idea of public safety is a part of cooperation. If we can encourage terrorists that are apprehended in the future to know that if they turn, they might get a sentencing break, that's going to promote Well, how does that apply after recantation? If there's been recantation, where is it, where's the character of the defendant to be valued? If there's been recantation, how do we encourage others to give information if it turns out you can recant and get away with it? Aren't we, in fact, encouraging recantation? Well, I think Judge Kunauer was aware that Mr. Rassam had mental health problems, and that was all explored early on as partial understanding of why he's where he is today in 2005. In 2008, he came back before the judge after three and a half more years of solitary confinement, not a second outside of solitary confinement. And the first thing he does is he says, I want to go pro se. So the judge sees a man who's the judge is making, you know, is evaluating Ahmed Rassam and the whole Ahmed Rassam and the Ahmed Rassam story. Did he have these mental health problems when he wanted to blow up the airport and when he entered into this agreement to help the government that he recanted? Did he have the mental health problems then? Well, Your Honor, if you read Dr. Grassi's report, and I think it's a powerful report, he talks about how Ahmed Rassam, when he got to Canada and couldn't get asylum, was floundering. And he had no direction, he had no moral compass, and he fell under the spell of these extremists. So he was at what he described as an emotional nadir at that point in time and began to do what he did. So in a sense, he did. This is a person who Dr. Grassi has said is not a psychopath by nature, is not a bad person by nature, but he was in a place and a time. This is a story we hear all the time from our clients where something goes wrong in their life and, as a result, they take the wrong turn. Well, most of them don't go to al-Qaeda training camps. I agree, Your Honor. But he did, in fact, fall under the spell of some of these extremists and he was very seduced by the powerful religious spell that was there and he did what he did. Do you think that's true of the people in 9-11 also, that they fell under that spell and should be treated lightly? Well, Your Honor, I would respectfully disagree that Mr. Bassam is being treated lightly, but... For a life sentence, 22 years is pretty light. My question is the same. Well, no, I had a previous question, too, which I want to start with, which is what standard do we apply to determine if something is substantively unreasonable? Do we look at the fact that this sentence is about one-third the guideline? Is that relevant? I mean, what are the factors we look at? How do we know when we see something that's too high or too low? Well, we know that the math isn't correct, Your Honor. The Supreme Court, in fact, rejected that as a basis for trying to make the analysis that you're asking me to speak to. Well, at least it helps not to make a hard and fast rule. Certainly, they talk about, the Court talks about the extent of the deviation. The extent of the departure is relevant consideration, but it's just the measure that the Court doesn't want to go through for the reason that the... So how do we know? Well... If the math isn't enough, how do we look at it and say this is shockingly low or shockingly high, as the case may be in any given instance? What I read from the opinions of this Court, where there's a dissent, and we're at the margin of what can possibly happen in this case. And we see very spirited debate among you when there's a sentence of probation in a serious crime, child pornography or white-collar fraud. In this case, the minimum that could be imposed was a 10-year sentence of imprisonment. And Judge Kunauer doubled that plus. He gave a sentence of 22 years' imprisonment. So we're not at that boundary, that boundary that... Because there was a 10-year minimum sentence for, was it count 1 or 9? 9. 9. So we had a 10-year statutory minimum for one of them. It suggests that that could be the minimum, but only if zero was given for all of the others, and two of the counts had to be consecutive. So it's not that all the counts could be sentenced concurrently. But my point is that Judge Kunauer didn't do that. What he did was he doubled it plus. He never did that. Right. He left it to the government to figure out how this 22 years would be divided up. Heightened up. Isn't that the case? Well, that's right. And I don't think anybody thinks that was inappropriate under the circumstances. Certainly it's not a matter that's been complained about. But in that regard, Your Honor, I think what we do is we look at the, what's been described in Muhammad as the unitary review for reasonableness. You look at the whole sentence to decide whether it's, the Court has taken into account rationally and meaningfully the considerations of 35. Mr. Hilliard, so in making that determination you're talking about, let's zero in on one fact or one sentencing fact, and that is danger to the community. I understand that if Mr. Assam serves the 22-year sentence minus whatever good time he's entitled to, he would be around 50 years old when he is released? I believe Mr. Assam is going to be 52 years old or 51. That counts as good time credits? If he gets all the good time that he's afforded. Okay. Which is a relatively young man, still capable. Seems younger all the time. Still entirely capable of duplicating his feet and maybe having been foiled once, maybe do it smarter. What if we look at this and say we really disagree, or any one of us, really disagrees with the district court's assessment on this one factor, on the danger to the community. We say, you know, we really think this guy is a lot more dangerous than the district judge thought he was. And we think there is a more than reasonable, more than trivial chance that if he gets released he will be back trying to cross one of our borders with even more potent and well-concealed explosives to cause even more danger. How do we weigh that into the substantive reasons of determination? Well, I would respectfully suggest it would be difficult to weigh into the case facts that don't exist. We don't have any information in this record that suggests that Mr. Assam We never do about the future. And yet the question is, danger to the community is one of the factors. And it's not even clear to me that it has to be a co-equal factor. And that's part of what I want to explore with you. Do we have to sort of treat it as just one or anything else? Or could we just say, look, this is really, really a very important factor, overarching, and if we have doubt on this score, that alone could be enough. I mean, that's one way of going. But whatever it is, you can never tell the future. We don't have machines to do it. You know, we don't believe in card reading or soothsaying. So we don't. We can just predict. And this is a guy who tried it once, which sets him apart from close to 6 billion other people. So what if we look at this record and say, gee, we think there is a possibility, a real possibility that at the age of 52, when he gets released, he will be deported to or removed, as we call it these days, to what's his nationality? What's his? He's Algerian, Your Honor. Algerian. Okay. To Algeria. Correct. And from there, within six months, he makes his way back into someplace that has a border with the United States. He's on an air border or a water border or a land border. And this time, by that time, explosives are even more compact and more difficult to detect. And we think he might just make it the next time. How do we weigh that? Your Honor, you're going into the realm of the district court to try to take measure of a person that you've never seen, never heard, never presided over his case. So I think what you're saying in that point is we can't do that. The district court makes that determination. We can't second-guess it. Even if we look at the record and we say we just really think the district court is wrong on this, we really think that your answer is too bad. Well, no. Mr. Hilliard, can you say we can't do that? But in this case, Judge Kuhnert didn't, I think it's fair to say Judge Kuhnert didn't emphasize that at all or not very much. And that's a big point that the government is making and that the majority in the panel before us emphasized as well. You say that we can't do it. What happens when the district court didn't do it either? Well, two points, if I might. First of all, I believe that the court did take that into account. And as the Unitary Review for Reasonable Standards says, there's no set way that a court answers the difficult questions that we're addressing here today. It can be through the Q&A method. It might be through, you know, responding to questions or arguments by the government. Or it can be from saying, here's what I'm doing and why. And in this case, Judge Kuhnert said, I believe this person's character is different than just a plain bad guy. I'm basing that upon what I know to be from the submissions I've received, his whole history. I'm basing it, too, upon a report provided by Dr. Grassian. Dr. Grassian said specifically, I do not think this man is going to provide future dangerousness. So when Judge Kuhnert announced his sentence, he said, I'm doing this based upon all the facts that I've expressed here in the record, drawing upon all of that information that he's been considering for years, very serious information that's there before him. But following up on Judge Mugia's question, if we don't think the district judge perhaps thought about this carefully or as deeply as we thought, it's certainly within our province to say, we really think the district judge should take another look and make sure that he is secure on this issue. You wouldn't think that that's beyond our authority. I don't. It's certainly not beyond your authority, Your Honor. What is the relevance in your view of the Eleventh Circuit's recent decision reversing a sentence in a potentially similar case as being unreasonably low? Well, can I answer that in just two phases? First of all, I think it's important to understand what Judge Kuhnert didn't do. And he didn't compare Mr. Rassam's sentence with Mr. Padilla's for some substantive reason. He said on the record at ER 39, I've talked about some cases, but each one of these has different facts than this case. And he says, I'm not, my decision is not influenced by any of these other influences. I'm giving you this backdrop so that there's some perspective here. And I think what he was doing there, and this is my first point, and I will give you a real question, Judge Graber. He's doing what a good judge does. He's engaged. He's in between the sentences now, and he's looking at all the terrorism cases that are out there. Because he gave 22 years. It's been challenged. He's thinking about it. Is this in the ballpark? Does this make any sense? He's actually predicting that what happened in Hingston, which is, is this sentence plausible? And he finds what he found, and certainly the sentence of 22 years is within the realm of plausibility, given all the cases that are out there. But to get to Mr. Padilla specifically, Mr. Padilla was, his sentence was substantively reversed because the, in terms of, well, there are a variety of reasons, but in terms of who he is, the court noted that he has 17 prior arrests. He has a murder conviction. It's a juvenile. It's a murder conviction. He's a recidivist. 17 arrests with juvenile arrests. I beg your pardon, Your Honor? 17 arrests with juvenile arrests, and they don't say anything about the convictions. Well, he, he, they were fresh enough that he qualified as a career offender, which implicates some statutory concerns with 1994. But do you really think that has much to do with these two offenses? Does it really matter whether somebody was a bad juvenile? I think not, Your Honor. I think you throw that case out the window. And the reason is none of them cooperate. There was no cooperation by Mr. Padilla. And that's the factor that's driving it. I think there was no cooperation about the cases that he was supposed to cooperate about. And when they did try to try the people, he withdrew his testimony. Well, Your Honor, Mr. Rassam's test, Mr. Rassam's evidence was used directly, direct testimony in two cases where convictions were achieved, and it was also used in, in several other prosecutions where convictions were achieved. So his testimony by deposition or other, or directly, and it's important to realize he's, you know, he's in the spotlight internationally with all this, was, did result in convictions here and in Europe. He did not testify against Mr. Doha and Mr. Muhammad. And at the, in the, at the beginning of, or towards the end of the first sentencing hearing, and I think it's important to recall that the prosecutor from the Southern District of New York in recommending 35 years emphasized, I don't want you to reward Mr. Rassam or try to tempt him to continue to cooperate by a light sentence. We're recommending 35 years in this case to take into account that those cases are done, they're dead. So, so, you know, that's, that's where it was then. But then he did renege on that, that agreement for reasons that I think are complicated, Your Honor. Roberts. What was the form of, of his recantation? How did he, how did he do that? Well, he, he wrote a letter to the judge. Judge Kunawer? Yes, yes he did. And Judge Kunawer forwarded to the parties and, and we forwarded in turn to whoever would be relevant on the far end. One was related to Mr. Wiery and... Was it a general recantation or was it specific? With respect to Mr. Wiery, I think he complained that he shouldn't have been convicted at that point in time. He had already been convicted. They used that information to try to successfully work a, a habeas case, but it didn't happen. So that happened. The recantation that occurred, as Ms. Bruner indicates, between 2005 and 2008 related to, to individuals that were not being actively prosecuted. But... And when those cases were dismissed, did the government rely on his recantation? I don't... Do you know? I don't, you know, I, the, one is a, what, what's, one was a subject to deportation proceedings in Canada. One was in Guantanamo Bay. That's, that was the status of those. I thought Ms. Bruner said there were two cases that were being prosecuted. No, I don't believe there were. I don't think there were any active prosecutions. And, and it's, you know, I think... Isn't it fair to say, though, that absent his testimony, they couldn't proceed with the intended prosecutions? I beg your pardon, Your Honor? Absent his testimony, that the government couldn't proceed on those two individuals at that time? Well, Doha, are you talking about the dismissed indictments? Yes. The Doha and the Mohammed. Yes. Well, he, he decided back in 2004-ish that I'm not going to do this anymore. And as a result of the 2005 sentencing, that, as the government said, these cases are done. Is the subtext here that with regard to Judge Cunero's assessment and the government's assessment somewhat different views about why he ended up recanting? I mean, the, the judge had dealt with him for a long time, I guess, when he said through the trial, but he also dealt with him in various sentencing proceedings. He knew something about the conditions in which he was being kept. He knew something about the, the set of interrogations and so on. And my, my sense was that he, he had some sense of, or his own sense, let's say, of why Mr. Ressin stopped cooperating. And the government seems to have a different one. And that really is a character assessment. Well, I, I think that's correct. I think Judge Cunero was making his call based upon what he was seeing, the, the man in front of him agonizing over all of this stuff, but also basing it upon the complex of reasons that were involved in, in, in Dr. Grassian's report. I think what is evident is that he wasn't doing it to help himself. He said it in his own sentencing when he was representing himself, give me life, I don't care. But he, I think Mr. Ressin from the beginning of his cooperation was obsessed with the idea that you're putting words into my, my mouth. And I want to be accurate here even during these, these many, many repetitive interrogations that occurred. And that process just continued on, continued on, and continued on. And I think it, Dr., or what Dr. Grassian and I think Judge Cunero adopted was the idea that the combination of the effects of confinement and the repetitive interrogations and this obsession that he had just caused him to pull within himself and say, I want control over this situation. I'm just done, you know, and, and that's basically what happened. Where does 9-11 fit into this? I beg your pardon, Your Honor. Where does 9-11, how does 9-11 fit into his level of cooperation? I mean, I, I read a newspaper report. I'm not going to reference anything under seal, but I did read a newspaper report that some of the information that he gave worked its way into the August 6th memo that was given to President Bush that said Al Qaeda plans to attack the United States. I don't know if you've seen that same article. Yeah, the main, the main reason we were doing that and, and the importance of all that is that timing of his cooperation was relevant. This is a man who, who, who was giving first time information about the inside of the most dangerous terrorist organization in the entire world. First time that ever happened, right at, right in the middle of 2001. And so, you know, prosecutors from throughout Europe and, and law enforcement were lining up to get that information and that line just grew longer at 9-11. So the timing could not have been more important than it, than it was. And that's, and I think the, the idea that it showed up in the, in the briefing of the President is an indicator. He's a guy, you know, that the public defender's office in Seattle is representing that is, you know, helping us. Did he know about 9-11, what was going to happen? No, he did not, Your Honor. Let me ask you, let's say we were, I have no idea what my colleague's saying. I'm not even sure what I think. But let's say we decided that the sentence is substantively unreasonable. What would be the course you would suggest proceeding? What can we do at that point? Specifically, can we, you remember the question asked of the government, can we say what sentence would be reasonable, or would we send it back? Should we send it back to a different judge? What, what, what would you propose? And I know that's a situation you don't want to think about, but. Well, you certainly. Since it's a possible situation, I want you to be able to address it. Well, you should not send it back to a different judge. I think that's clear. The government, and we all believe Judge Kunawer is the person for this case. In the panel's decision, the government, in its reply, as you know, to this petition, indicated we have trust in the fairness of Judge Kunawer. Nobody wants that. This is a person that's lived with this case for a decade. It's not humanly possible for anybody else to judge it. But what happens? I suppose it would depend upon why you would say that, Your Honor. Is there a discrete reason? Is there something that you don't think was measured and that needs to be measured in a way? I would argue that the recantation, for example, everything was known in 2005. The only thing that changed between 2005 and 2008 was the recantation. And Judge Kunawer didn't find that particularly significant. So I would argue that the Court should be wary about sending a message that if there's a change in circumstances, it must be measured, because that would mean that in any case where one of my clients, and I would welcome this, who makes progress in prison but comes back to sentencing, that that should be taken into account to lower that sentence. It isn't just any change. I'm over here. The principal justification for giving a sentence of 22 years down from 65 years was cooperation. And we had between 2005 and 2008 not only pulling back but affirmative recantation. Now, it seems to me if the justification for the departure in the first place is cooperation and if cooperation is not only stopped and disavowed, that justifies at least some comment by the district court as to why it shouldn't pay some attention to that change of fact. And that's the thing that's mystified me the most here. I can't see where Judge Kunawer has affirmatively explained why it is he thought, as he said in the second sentencing, my original sentence was correct. In effect, he seems to disregard everything that's happened in between. Now, do you have a different view of this? Did he disregard it or did he take it into account? And if he took it into account, what's the justification for saying it didn't matter? Well, again, I think you look at the record as a whole and he talks about the information he received about who Mr. Rassam is and what the issues he has mentally, which played into the original sentence and, if anything, are worse now after three-and-a-half more years of incarceration. And they didn't materially impact the ongoing worth of the cooperation that was provided or you can't put the genie back in the bottle on all the good that had occurred. So I think he felt that with respect to the cooperation, it had no real material impact. But recantations between L-5 and L-8 didn't have any practical impact, did they? I think that's what he was saying. Basically, he said what I said before isn't true anymore, but he'd already said it and it already had whatever impact it had. Right. And I think he did say that in the context of the Wari decision where in a post-sentencing motion, he indicated to that was based in part about that, hey, look, this didn't have any impact on that, so, you know, it doesn't matter. I see I'm over. You are over. Thank you. We took up most of the Governor's time with questions. If you'd like two minutes for a bottle, you may have it. Thank you, Your Honor. I will take it and I'll be brief. First, with respect to the cooperation, I would simply point out that the testimony of Agent Humphreys is from ER 251 through 274. And what's clear from that is that although the information was in unclassified form, what Agent Humphreys says is that this information was the intelligence value was in fact known in classified form. So you have to make that distinction. It's clear that that helped law enforcement because it was able to be disseminated to law enforcement because it was unclassified, but the information was known. This was not new information. As to the recantations, let me be clear. There were three individuals for whom there was recantation directly between 2005 and 2008. One was a letter to Judge Kunauer related to Hassan Samiri, who was at that time being held in Guantanamo Bay. The other was with respect to Harari, the individual against whom Rassam testified in New York. That was provided and became the subject of a 2255 motion. And although the Second Circuit, the district court, neither the district court nor the Second Circuit found that to be a reason to overturn Harari's conviction, nonetheless, there was litigation over it. And the third related to an individual in Canada called Shikauri, and indeed, I think that led to his release. Finally, with respect to the recantation, I would note simply that at his statements at the 2008 hearing, and that is really the only time that he's provided statements to the court, the court said, I restate my words finally. I retrieve all the statements that I previously made to the investigators, so don't count on them because they were wrong. So I think from that, we can take full recantation. Could I just ask you to clarify one thing that you said earlier? Did you say that your office had only appealed two sentences as too light? No. What did you say? What I said, Your Honor, was that in the two and a half years, in the last two and a half years, the Department of Justice had only appealed to this court once. Once. And that was this case as being substantively unreasonable. So this is the only one? This is the only one. Thank you. With respect to the conditions of confinement, I would simply note that Dr. Grassian's report actually talked a little bit about his time at the Seattle Tacoma Detention Center and the fact that it wasn't that harsh. He was not in solitary confinement for a period of time as a result of information. You had Whitehead, right? That was the last one. Pardon me? Whitehead was your last appeal. Whitehead? I believe that's correct, Your Honor. This was the blue access case? Yes. I actually looked at the Solicitor General's approvals from 2008, 2009, 2010, 2011. That was the best. Anyway, your time is up. Thank you, Your Honor. Thank you, counsel, for a very well-argued case. Thank you, both of you. We are adjourned.
judges: Kozinski, Schroeder, Reinhardt, Graber, McKeown, Wardlaw, Paez, Berzon, Clifton, Bybee, Murguia, Alarcon, Fernandez, Clifton